# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANGEL TURNER, KENYATTA STARKS, and ANGEL JOHNSON, | ) ) ) |
| Plaintiffs, | ) ) ) No. 17 C 6507 |
| v. | ) ) ) Judge Jorge L. Alonso |
| CITY OF CHICAGO BOARD OF EDUCATION, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant Board of Education of the City of Chicago's ("Board's") motion to dismiss plaintiffs' Second Amended Complaint. For the following reasons, the motion is granted in part and denied in part.

## I. BACKGROUND

The Board is a local governmental entity that maintains and operates Chicago's public school system. Plaintiffs, Angel Turner, Kenyatta Starks, and Angel Johnson, who are African-American, work in the field of education in Chicago. Turner, a former Board employee, works for the Academy for Urban School Leadership, which manages certain Board schools. In 2016, one of the schools she was assigned to oversee was Orr Academy High School ("Orr Academy"). Starks and Johnson, who now work for Chicago International Charter School Longwood, a Board-funded charter school, previously served as principal and (in Johnson's case) also vice-principal at Marshall High School ("Marshall"), a Board school.

In 2016, the Chicago Public Schools ("CPS") Office of the Inspector General ("OIG") contacted Turner to ask about student attendance records at Orr Academy. Similarly, the OIG

contacted Starks and Johnson to ask about student attendance records at Marshall High School during their tenures there.

On October 6, 2016, the OIG issued a report accusing Turner of being negligent in her supervision of the administration of Orr Academy and accusing Starks and Johnson of falsifying attendance records at Marshall. As a result of the investigation and report, the Board placed "Do Not Hire" ("DNH") designations in plaintiffs' files,[1] which effectively prevent plaintiffs from working for the Board again. Additionally, in July 2018, the Director of Employee Engagement for CPS sent a letter to the Illinois State Board of Education ("ISBE"), claiming to have reason to believe that Turner and Starks had committed misconduct that may have included committing intentional acts of child abuse or neglect. The Board later retracted the letters.

Plaintiffs allege that they were not negligent in supervising the administration of their schools, nor did they falsify any attendance records; rather, they followed proper procedures at all times. Further, plaintiffs allege that the Board did not issue DNH notices or take any other adverse action against non-African-American principals of other Board schools, including Juarez, North Grand, and Washington High Schools, who had been accused of employing similar attendance-record practices and procedures.

Starks claims to have applied for employment with the Board since receiving the DNH notice, but she has not been accepted for hire. (2d Am. Compl., Count III ¶ 31, ECF No. 86.) Johnson alleges that, in or about September 2016, Tammy Jackson, president of the local school council ("LSC") for Robert Black Magnet Elementary School, contacted her to request that she apply for a vacant principal position. Two weeks later, Jackson informed Johnson that the OIG

---

[1] Although plaintiffs are not presently CPS employees, CPS has maintained the personnel files it created for them when they previously worked in CPS.

2

had informed the LSC that "something was happening with Johnson and her former school and that the LSC decided not to advance Johnson's resume to the next level." (*Id.* Count V ¶ 31.)

Based on these allegations, plaintiffs seek relief for race discrimination under Title VII of the Civil Rights Act of 1964 (in Counts I, III, and V) and under the Illinois Freedom of Information Act ("FOIA") (in Counts II, III, and VI). Defendants move to dismiss.

## II. STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Fin. Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). Conclusory allegations "are not entitled to be assumed true," nor are legal conclusions. *Iqbal*, 556 U.S. at 680, 681 (noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously agreed to subject

3

[him]' to harsh conditions of confinement"). The notice-pleading rule "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-679.

## III. DISCUSSION

Defendants move to dismiss on the following grounds: (1) Johnson and Starks do not meet their pleading burden on their Title VII failure to hire claims; (2) Turner and Starks do not state a Title VII claim relating to the ISBE letters, or alternatively, these claims are not ripe; (3) plaintiffs fail to allege an employment relationship with the Board; (4) plaintiffs did not suffer an adverse employment action under Title VII; (5) plaintiffs' claims are outside the scope of their EEOC charges; and (6) the Court should decline to exercise supplemental jurisdiction over plaintiffs' state-law FOIA claims.

### A. Plaintiffs' prima facie case

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

The crux of plaintiffs' Title VII claims is that the Board was discriminating against them on the basis of race when it placed "Do Not Hire" notices in their records at CPS. Plaintiffs allege that the CPS OIG found similar attendance-records issues at other schools, but it did not place DNH notices in the records of non-African-American administrators at those other schools. The effect of a DNH notice is that CPS will not rehire any of these plaintiffs, now or at any time in the

future. In their brief, plaintiffs argue that their allegations concerning the DNH designations state a Title VII failure to hire claim. According to plaintiffs, such a claim does not depend on whether they were employed by the Board at the time of the 2016 DNH designations (they do not allege that they were, and Title VII countenances claims for refusal to hire, which do not require such allegations), nor does it depend on whether the ISBE letters were adverse actions; the allegations relating to the ISBE letters serve only to illustrate that the DNH designations might harm their careers by affecting prospects of employment not only with the Board but with other employers as well.

The Board argues that plaintiffs' allegations do not establish the elements of a prima facie case of discriminatory failure to hire under Title VII, relying on the traditional, oft-cited standard articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the *McDonnell Douglas* framework, a plaintiff must show that (i) she belongs to a protected class; (ii) she applied and was qualified for a job for which the employer was seeking applicants; (iii) despite her qualifications, she was rejected; and (iv) after her rejection, the position remained open (or was filled by someone not in the protected class). *Id.*; *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination."); *Bennet v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002).

According to the Board, plaintiffs fail to meet this standard because they do not allege in sufficient detail that they applied for positions the Board was seeking to fill, but were rejected based on their race. Turner does not allege that she has applied for employment with the Board subsequent to receiving her DNH designation. Starks alleges, without elaborating, that she "has

5

applied for employment with Chicago Public Schools subsequent to the receipt of her 'DNH' but has not been accepted for hire." (2d Am. Compl. Count III ¶ 31.) Only Johnson describes a specific position in which she was interested but that she was not offered.

### 1. *Prima facie case—Turner*

The Board argues that by failing to allege that she applied, but was turned down, for any specific position, Turner to fails to make out the second element of a prima facie case under *McDonnell Douglas*, which is fatal to her failure to hire claim.

The Court does not entirely agree; *by itself*, the failure to allege that she applied for a job does not defeat Turner's claim. In *McDonnell Douglas*, the Supreme Court explained that "[t]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required [in *McDonnell Douglas*] . . . is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13; *see Burdine*, 450 U.S. at 253 n. 6 ("In *McDonnell Douglas* . . . , we described an appropriate model for a prima facie case . . . [but] we added . . . that this standard is not inflexible.").

In a Title VII action brought by the Attorney General to remedy a "pattern or practice" of discrimination pursuant to 42 U.S.C. § 2000e-6, the Supreme Court held that, *McDonnell Douglas* notwithstanding, the "failure to apply for a job is not an inexorable bar" to Title VII relief:

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by [such things as] the manner in which he publicizes vacancies [or] his recruitment techniques . . . . **When a person's desire**

> *for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application*.

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 364, 365-66 (1977) (emphasis added).

The Seventh Circuit has applied the reasoning of *Teamsters* in cases brought by individual plaintiffs, describing the *McDonnell Douglas* formulation of the prima facie case as a "common, but not exclusive, method of establishing a triable issue of intentional discrimination." *Loyd v. Phillips Bros.*, 25 F.3d 518, 522-23 (7th Cir. 1994). In *Loyd*, the Court explained that a job application is a critical element in the context of cases like *McDonnell Douglas* because it "closes the causal gap between the employer's decisionmaking process and the complained-of condition of the employee, thus allowing a tentative inference of bad motive on the employer's part." *Id.* at 523. That is, the job application forms a link in an inferential chain leading to the conclusion that the defendant treated the plaintiff differently based on membership in a protected class. However, it does not follow that, in different circumstances, "the causal gap can never be bridged by something short of the formal submission of an application":

> The factual setting of a dispute, not an abstracted formulation never intended to be all things to all cases, will determine what steps a plaintiff needed to have taken in order to sufficiently demonstrate that discriminatory decisionmaking may have actually affected his employment situation. ***For instance, where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established***.

*Id.* (emphasis added) (citing *Teamsters*, 431 U.S. at 362-71 and *Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 867 (7th Cir. 1985)); *see Teamsters*, 431 U.S. at 367 ("[A] nonapplicant can be a victim of unlawful discrimination entitled to make-whole relief when an

application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him.").

Relying in part on this discussion in *Loyd*, the Seventh Circuit has held that, in certain circumstances, the failure to inform an individual of job vacancies may be an adverse employment action that supports a Title VII claim if it prevents a non-employee from applying for positions she otherwise would have. In *Volling v. Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 381-82 (7th Cir. 2016), the plaintiffs, who had previously complained of sexual harassment, worked for a paramedic services subcontractor that lost its contract with a local rescue squad operator to another subcontractor. The new subcontractor contacted all of the old subcontractor's employees—except the plaintiffs—to instruct them on how to apply for employment. The plaintiffs sued the new subcontractor and the rescue squad operator, claiming that, unlike all of their former co-workers, they had not been offered employment, in retaliation for their past complaints of sexual harassment. The defendants argued that the plaintiffs could not state a claim under Title VII because they never submitted employment applications. Reasoning that, as it had explained in *Loyd*, the application requirement can be "relaxed" where "a plaintiff is deterred from applying by the very discriminatory practices he is protesting," the Seventh Circuit concluded that the plaintiffs had stated a Title VII claim by alleging that they had complained of sexual harassment and the new subcontractor had intentionally excluded them by pointedly omitting to notify them, alone of all the old subcontractor's employees, of how to apply for employment. *Volling*, 840 F.3d at 383-84.

In *Volling*, the court relied not only on *Loyd* but also on *Babrocky*, 773 F.2d at 867, in which Jewel Food Company ("Jewel"), employed in its Northwest Indiana meat markets two classes of employees: meat cutters (all of whom were men) and meat wrappers (all of whom were

8

women). When Jewel laid off all of its Northwest Indiana meat wrappers, but no meat cutters, the meat wrappers filed suit under Title VII, claiming, among other things, that Jewel had maintained "sex-segregated job classifications." *Id.* at 866. The district court rejected this claim because the plaintiffs had never formally applied for meat-cutter positions, but the Seventh Circuit reversed, explaining that the district court had "appl[ied] the *McDonnell Douglas* framework too literally":

> ***Because an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless, even nonapplicants can in appropriate circumstances qualify for relief under Title VII.*** [In *Teamsters*, 431 U.S. at 365, the Supreme] Court's explicit reference to "the manner in which [the employer] publicizes vacancies," *id.,* as one of the ways in which such implicit messages are communicated, is particularly telling. In the instant situation Jewel evidently filled its meat-cutter positions through the Union's hiring hall. No notices of vacancies were ever posted, nor had the Union ever recommended any of its women members for these positions. Consequently the plaintiffs were never informed of the vacancies for which they could apply. Therefore, the district court's reliance on the plaintiffs' admissions that they had never applied for meat-cutter positions was misguided.

*Id.* at 867 (emphasis added).

If, as these cases establish, a plaintiff can state a Title VII claim by alleging that an employer prevented her, unlike people not of the protected class, from applying for a position she desired by failing to inform her of the opportunity, *see Volling*, 840 F.3d at 384-85, the Court fails to see why the result should be any different when she alleges instead that the employer prevented her from applying by directly informing her that her application would be a "futile gesture," *Teamsters*, 431 U.S. at 365-66. Either way, the employer has "create[d] an atmosphere" in which the former employee "understand[s] that [her] applying for certain positions is fruitless," *Babrocky*, 773 F.2d at 867, and in this case, the Board has done so as clearly, if not more so, than the defendants in *Volling* and *Babrocky*.[2]

---

[2] The Court notes that plaintiffs do not cite these cases in their response brief; indeed, alarmingly, they cite no cases at all. Responding to a dispositive motion without citing any supporting legal authority exposes a litigant to arguments of waiver or forfeiture. *See, e.g., Gondeck v. A Clear Title & Escrow Exch., LLC*, No.

9

However, a nonapplicant asserting a Title VII claim must allege not only that a discriminatory practice prevented her from applying for employment, but also that, absent the employer's discriminatory conduct, she "would have sought the position." *Volling*, 840 F.3d at 384; *see Teamsters*, 431 U.S. at 368 ("A nonapplicant [has] the not always easy burden of proving that he would have applied for the job had it not been for [the employer's discriminatory] practices."); *Loyd*, 25 F.3d at 523 ("If the plaintiff alleges that the employer's decision not to approach people of her status was itself illegitimately motivated and shows that but for such a practice she likely would have been approached, then all she must do to complete the chain of causation . . . is establish that, ***had the employer approached her, she would have accepted the offered position***.") (emphasis added).

Turner nowhere alleges in her complaint that, since receiving the DNH notice in 2016, she intended to apply for employment with the Board or that she intends to do so in the future, nor does she make any such argument in her response brief. Instead, in their brief, plaintiffs argue that the DNH designations are themselves sufficient to state a failure to hire claim because, after the DNH notices were placed in their files, it is "self-evident . . . that if [plaintiffs] were not even considered for selection for any positions . . . then [the Board] naturally sought and hired [other] candidates." (Pl.'s Resp. Br. at 2, ECF No. 110). Later, they argue that "the adverse action is that Defendant refused to hire Plaintiffs when they issued DNH notices to Plaintiffs." (*Id.* at 6.)

Under the above-cited cases, it is not enough that the Board told plaintiffs that it will not hire them; plaintiffs must also demonstrate that they are genuinely interested in obtaining

---

11 C 6341, 2013 WL 4564994, at *3 (N.D. Ill. Aug. 28, 2013). Defendant did not raise a waiver or forfeiture argument based on the absence of supporting legal authority, but the Court warns plaintiffs that it need not "do [their] research for [them]." *United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990).

employment with the Board. *See Loyd*, 25 F.3d at 523 (employee need not submit formal application, but must show more than a "vague interest" in promotion because, without some "firm indication of what her employment desires were," it is "impossible to identify the discriminatory harm"); *see also Mauro v. S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000) (employee not informed of a particular opportunity for promotion stated Title VII claim without having submitted formal application because he had "clearly indicated his interest in a promotion" to his employer). Turner makes no such allegations, and without them, she not only fails to state a claim; she does not have Article III standing to assert one. *Cf. Worth v. Jackson*, 451 F.3d 854, 859 (D.C. Cir. 2006) (nonapplicant had standing to assert Title VII claim that employer's discriminatory hiring policy prevented him from obtaining a position because he alleged that he was going to apply for a job "sometime in the relatively near future").

Plaintiffs argue in their response brief that, apart from any failure to hire, the DNH designation harmed Turner in other ways, particularly by requiring her to use a month of paid leave that she would not have otherwise used. According to plaintiffs, based on the DNR designation, Turner was denied access to CPS facilities, which she needed even in her AUSL position, and she had to take leave for a month until she obtained access to CPS property again. But the Court fails to see how this aids Turner in stating a failure to hire claim, to the extent it is an argument that Turner was harmed by the Board in her *current* position at AUSL. Plaintiffs do not spell out by what theory under Title VII the Board might be liable to her for actions it took that interfered with her relationship with her current employer, and the Court doubts that Turner can prevail under any such theory, particularly given that the Board appears to be a mere "consumer" of services her employer provides. *Se Mays v. BNSF Ry. Co.*, 974 F. Supp. 2d 1166, 1174-75 (N.D. Ill. 2013). In their response brief, plaintiffs disclaim any argument that the Board jointly employs plaintiffs or

11

that their claims are anything other than failure to hire claims; if so, then the Court fails to see how allegations of consequences *beyond* the Board's failure to hire Turner assist her in stating a claim. Such allegations may add to Turner's damages, but she must state a claim before damages come into play. She has not done so.

The Board's motion to dismiss is granted as to Turner's Title VII claim.

### 2. *Prima facie case—Starks*

Starks alleges that she has applied for employment at CPS, but not been accepted for hire. Apparently, she has received no word from the Board concerning her application, whether of acceptance, rejection, or otherwise. (*See* 2d Am. Compl. Count III ¶ 31 ("Starks has applied for employment with Chicago Public Schools subsequent to the receipt of her 'DNH' but has not been accepted for hire.")[3]; Pl.'s Resp. Br. at 5.) The Board argues that Starks's failure to hire claim must fail because she does not allege that she was rejected in favor of a person not in her protected class, and her allegation that she applied for a job after receiving her DNH notice lacks the specificity required to provide fair notice of her claim.

The Court disagrees. Again, the Board's argument depends on a rigid application of the *McDonnell Douglas* standard that neither *McDonnell Douglas* itself nor later cases require. The Board's allegedly discriminatory wrongdoing began with the OIG investigation, and the heart of it occurred when the Board issued the DNH notice, prior to the time of the application Starks allegedly submitted. Putting the DNH designation in Starks's file makes the failure to hire her a

---

[3] The Board argues in its reply brief that plaintiffs admitted in a previous version of their complaint that Starks has had a DNH designation in her file since 2011-2012, well before the OIG investigation took place in 2016. Plaintiffs allege in the Second Amended Complaint that the OIG issued a report falsely accusing Starks of falsifying attendance records at Marshall High School and, "at the direction of OIG," CPS "placed a [DNH] on Starks['s] record." (2d Am. Compl. Count III ¶¶ 19-20.) Amended pleadings supersede earlier pleadings, and at the motion to dismiss stage, the Court must assume the allegations of the complaint are true and draw reasonable inferences in plaintiffs' favor. Plaintiffs have sufficiently alleged that CPS placed the DNH in Starks's file due to the OIG investigation in 2016, so their complaint survives the Board's motion to dismiss on that basis.

forgone conclusion, a mechanistic bureaucratic consequence of the DNH. Because the core of the discrimination occurred prior to the time of application, the details of Starks's job application are not of central importance. Starks's case is more like the nonapplicant cases the Court has discussed above than a classic *McDonnell Douglas* failure to hire case, even though Starks, unlike Turner, *did* submit an application.

As the Court has explained above, plaintiffs can state a claim by alleging that the Board discriminated against them by sending them DNH notices, effectively precluding them from applying for employment unless they chose to voluntarily "subject themselves to the humiliation of explicit and certain rejection," *Teamsters*, 431 U.S. at 365, provided they also demonstrate that they would accept a position if offered. Instead of merely alleging that she would accept a position if offered, Starks demonstrated it by actually submitting a job application. She was not required to "subject [herself] to the humiliation of explicit and certain rejection," but by alleging that she did so anyway, she states a prima facie case of employment discrimination.

While the Board is correct that Starks's allegations lack specificity with respect to her job application, and it is true as a general matter that a plaintiff must offer more than a "formulaic recitation of the elements of the cause of action," *see Twombly*, 550 U.S. at 555; *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009), it is also true that a plaintiff need include only very slight detail to survive a motion to dismiss in an employment discrimination case. To state a Title VII claim, the complaint "need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of" membership in a protected class. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008); *see Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826–28 (7th Cir. 2014) (citing, *inter alia*, *Tamayo*).

13

To the extent those responsible for Starks's DNH designation acted with the intention to prevent Starks from being hired, Starks's claim is properly based on *their* pre-application conduct. *See Owens v. Bd. of Educ. of the City of Chicago*, No. 15 C 1089, 2016 WL 4611387, at *5-6 (N.D. Ill. Sept. 6, 2016), *rev'd in part on other grounds*, 867 F.3d 814 (7th Cir. 2017). Further, Starks's allegations that the investigation and notice were discriminatory are not purely conclusory because she alleges that the OIG investigation identified non-African-American principals at three other Board schools—Juarez, North Grand and Washington High Schools—who engaged in the same attendance-record practices, but no adverse action was taken against them. Assuming the truth of these facts, a jury could reasonably infer that Starks was treated differently because of her race. Starks provides enough detail to provide the Board with fair notice of her claim of employment discrimination in failing to hire her.

The Board's motion to dismiss is denied as to Starks's Title VII claim.

### 3. *Prima facie case—Johnson*

Johnson's allegations are the most detailed. She alleges that she applied for a principal position at Robert Black Magnet Elementary School ("Robert Black"), but the Board or the CPS OIG informed the LSC "that something was happening with Johnson and her former school," and the LSC "decided not to advance Johnson's resume to the next level." (2d Am. Compl. Count V ¶ 31.) The Board argues that these allegations are insufficient because plaintiffs do not connect them to the DNH notice—in fact, it is unclear that the DNH notice had even been issued at the time that the LSC decided not to advance Johnson's application. Additionally, the Board argues that Johnson's allegations are insufficient because she does not allege that she was rejected for this position based on her race or that the Board hired someone for the position who was outside of her protected racial class.

14

The Court disagrees. First, even if it were necessary to connect the LSC's decision not to advance Johnson's Robert Black application to the DNH notice, plaintiffs' allegations on this point are sufficient: they allege that the LSC rejected Johnson after it got wind of the allegedly discriminatory investigation that led to the DNH notice. To require more detail than this, particularly considering that plaintiffs are unlikely to have access to or knowledge of the content of any private communications that may have passed between the Board, OIG, and Robert Black LSC, would impose a greater pleading burden on Johnson than the law requires. *See Carlson*, 758 F.3d at 826-28.

As for whether Johnson alleges that the LSC's decision was based on race or whether the LSC hired someone not of the protected class, Johnson's allegations are sufficient in these respects for the same reasons Starks's allegations are sufficient: it is not principally the LSC's conduct that matters but the conduct of those who conducted the investigation and issued the DNH notice on behalf of the Board, to the extent that they intended to prevent Johnson from becoming a Board employee based on her race, *see Owens*, 2016 WL 4611387, at *5-6. Further, the allegations that non-African-American principals at Juarez, North Grand and Washington High Schools engaged in the same attendance-record practices, but suffered no adverse action, suffice to show that people not of the protected class were treated differently. Johnson has made out a prima facie case of employment discrimination in failing to hire her.

The Board's motion to dismiss is denied as to Johnson's Title VII claim.

### B. Exhaustion of Administrative Remedies

Before filing a federal lawsuit under Title VII, a plaintiff must file a charge of discrimination before the EEOC, or her suit is barred. *Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 921 (7th Cir. 2007). "The test for determining whether an EEOC charge encompasses the claims in a complaint [is whether they] are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Cheek v. W. & S. Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994)

15

(quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7th Cir. 1976)). Stated slightly differently, the test is satisfied "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.*

*Escarzaga v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, No. 15 C 2568, 2015 WL 6445606, at *2 (N.D. Ill. Oct. 23, 2015). In their EEOC charges, plaintiffs described their current employment, their former employment at CPS, their contact with the CPS OIG regarding attendance records at their former CPS schools, the issuance of the 2016 OIG report finding that they had falsified attendance records, and the DNH designations placed in their files. The Board argues that their failure to hire claims are not exhausted because none of their EEOC charges, not even Johnson's, included any allegations of any position they sought but were not offered due to the DNH designations, nor do they mention the ISBE letters.

As the Court has explained above, in the circumstances of this case, plaintiffs' claims need not include allegations of specific positions they sought but did not receive, nor do they depend on the ISBE letters, which, plaintiffs concede, are merely background facts, not essential elements of their claims. If these details are not essential to the claim, then they are surely not essential to the EEOC charge. Additionally, the failure to hire plaintiffs is a direct consequence of the DNH designations, which are the subject of the EEOC charges, so surely any investigation of the allegations of the EEOC charges would have revealed them. Plaintiffs' claims need not be exactly coextensive with the allegations in the charges; they need only be "reasonably . . . expected to grow out of an EEOC investigation of the allegations of the charge[s]." *Cheek*, 31 F.3d at 500. It is reasonable to expect plaintiffs' claims to grow out of their EEOC charges in this case.

Plaintiffs do not address exhaustion at all in their response brief, and in reply, defendants argue that plaintiffs have therefore waived any argument on that issue. Generally, the Court would

16

agree that failure to respond to an argument in a motion to dismiss should operate as waiver, *see, e.g., Mohammed v. Sidecar Techs. Inc.*, No. 16 C 2538, 2016 WL 6647946, at *6 (N.D. Ill. Nov. 10, 2016), but it is clear on the face of the complaint and its exhibits that plaintiffs' claims are within the scope of their EEOC charges, and any argument plaintiffs might have offered would have added little to the Court's decisionmaking, so the Court is unwilling to impose the harsh punishment of waiver for this apparent oversight. *Cf. Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

Plaintiffs' claims are within the scope of plaintiffs' EEOC charges, so defendants' motion to dismiss is denied as to this argument.

### C. Supplemental Jurisdiction Over State-Law FOIA Claims

The Board argues that, if the Court dismisses all of plaintiffs' federal claims, it should decline to exercise supplemental jurisdiction over their state-law FOIA claims and dismiss them, without prejudice to refiling in state court. Because the Court has not dismissed all of plaintiffs' federal claims, it need not reach this argument.

### IV. CONCLUSION

Defendants' motion to dismiss [92] is granted in part and denied in part. The motion is granted as to plaintiff Turner's Title VII claim, which is dismissed without prejudice; the motion is otherwise denied. Plaintiffs may file an amended complaint reasserting Turner's Title VII claim, if they can do so in compliance with the Federal Rules of Civil Procedure and consistently with this Opinion, by May 24, 2019. The Court does not grant plaintiffs leave to assert any new claims

other than the Title VII failure to hire claims and FOIA claims asserted in the Second Amended Complaint. A status hearing is set for 5/28/19 at 9:30 a.m.

SO ORDERED.                                              ENTERED: May 2, 2019

_____
**JORGE L. ALONSO**
**United States District Judge**